## McDowell *versus* Addams *et al.*

*Who are "next of kin" under the Intestate Laws.— Collateral inheritance tax, when payable by lineal heir.— Grain growing at death of intestate passes with the inheritance.— Collateral and lineal consanguinity, rules relative to discussed.*

1. Under the Intestate Act of 8th April 1833, the "*next of kin*" are to be ascertained by the rules of the civil and not of the canon law.

2. Hence, where one dies intestate, with no nearer kindred than a grandmother and uncles and aunts, the grandmother is entitled to his estate, as next of kin, though she was in the ascending and not in the descending line.

3. The estate, thus passing to her, is subject to the collateral inheritance tax.

4. The landlord's share of grain, growing at the death of the intestate, passed with the inheritance to the grandmother, as the heir.

APPEAL from the Orphans' Court of *Cumberland county.*

This was an appeal by Jane McDowell from the decree of the Orphans' Court distributing the balance in the hands of James Anderson, administrator, &c., of Samuel McDowell Addams, deceased.

The case was this :—The intestate, Samuel McDowell Addams, died on the 23d day of September 1861, leaving no issue. His relations surviving him were William Addams and Samuel L. Addams, brothers, and Eliza Junkin, sister of the intestate's father, and Samuel H. Addams, a son of Harkness Addams, who was also a brother of intestate's father. He left also surviving him, John McDowell, George McDowell, Margaret McKinney, and Rosanna Barr, who were brothers and sisters of the mother of the intestate, and also Jane McDowell, who was his maternal grandmother. At the time of his death he was seised of real estate, and possessed of personal property. The real estate was in the occupancy of tenants. On the 2d of October 1861, letters of administration were granted to James Anderson, who accepted the trust regularly, and proceeded to discharge the duties of his office. On the 18th of November 1861, a petition for a writ of partition of the real estate was presented to the court, on which an inquisition was found December 3d 1861, dividing the same into five parts, which were taken, respectively, at the valuation, by the above-named William Addams, Samuel Addams, Eliza Junkin, and the devisees of Samuel H. Addams, who died a short time after the death of the intestate. These proceedings in partition were confirmed December 17th 1861, and the parties named entered into possession of, and now hold, the real estate of the decedent. There was a crop of corn growing on the land of the intestate at the time of his death, which was not severed from the ground until about the 15th of October following, when it was taken off by the tenant, put into

cribs, and subsequently divided and delivered to those who had taken the real estate under the proceedings in partition. On the 14th of June 1862, James Anderson, the administrator, filed his account, showing a balance in his hands of $8003.31. This account was presented to the court for confirmation on the 19th day of August following, when there were exceptions filed to it, and J. W. Weakly, Esq., was appointed to report the facts to the court. The exceptions were as follows:—

1st. The accountant has erred in failing to charge himself, in his account, with the sum of $575.83, being the proceeds of the sale of corn in the ground at the death of his intestate.

2d. The accountant has erred in claiming credit in his account for the sum of $420.55, being the amount of collateral inheritance tax paid by him on the fund in his hands; because there can be no collateral inheritance tax legally charged on said fund, the grandmother of the deceased being entitled to the money.

The question raised by the first exception was whether that portion of grain growing on the land of the intestate at the time of his death, which, had he lived until it was harvested, would have been given to him as rent, passed to his administrator or to his heir with the land inherited. The auditor, in an elaborate report, in which the authorities were fully examined, decided that it passed with the inheritance to the heir.

The second exception presented the question, To whom did the personal estate of the intestate pass? It was claimed by the brothers and sister of the intestate's father, and also by the maternal grandmother of the intestate—both parties claiming it under the 24th section of the Act of 1833, as being the "next of kin" within the meaning of the act.

The auditor decided that the grandmother of the intestate, Mrs. Jane McDowell, was entitled to the entire balance remaining in the hands of the administrator, she being related to the intestate in the second degree, and his next of kin within the meaning of the act; and that the accountant was entitled to the credit for $420.55, paid by him as collateral inheritance tax on the fund in his hands. To this report exceptions were filed for Mrs. McDowell, renewing in effect the exceptions which had been filed against the confirmation of the account. The administrator also excepted to so much of the report as decided that the estate descended to the maternal grandmother under the Act of Assembly.

The Orphans' Court, on hearing the case, confirmed the report of the auditor; which was the error assigned here by the appellant.

J. McD. Sharpe, for appellant.

Watts & Parker, for appellees.

[McDowell *v.* Addams *et al.*]

The opinion of the court was delivered, July 1st 1863, by

WOODWARD, J.—Consanguinity is either lineal or collateral. Lineal is that which subsists between persons of whom one is descended in a right line from the other. Every generation in this direct lineal consanguinity constitutes a degree, reckoning either upwards or downwards. Collateral consanguinity is that which subsists between persons who lineally descend from the same ancestor, who is the *stirps* or root, but who do not descend the one from the other. There are two methods of computing the degrees of consanguinity : one by the canon law, which has been adopted into the common law of descents in England, and the other by the civil law, which is followed both there and here in determining who is entitled as next of kin to administer the personalty of a decedent. The computation by the canon law, says Cruise, 3 Dig. 339, is as follows : " We begin at the common ancestor, and reckon downwards; and in whatever degree the two persons, or the most remote of them, is distant from the common ancestor, that is the degree in which they are said to be related. By the civil law, the computation is from the intestate up to the common ancestor of the intestate, and the person whose relationship is sought after, and then down to that person, reckoning a degree for each person, both ascending and descending. By this mode the intestate is taken as the *terminus a quo*, and the propinquity to him of any collateral relative is determined by the sum of the degrees in both lines to the common ancestor."

The clearest and most comprehensive exposition of the subject which I have found, is in 2 Coke Lit. star p. 158 (Thomas Ed., p. 129), as follows : " It is to be noted that in every line the person must be reckoned from whom the computation is made. And there is no difference between the canon and civil law in the ascending and descending line, but in the collateral line there is. Therefore, if we will know in what degree two of kindred do stand according to the civil law, we must begin our reckoning from one by ascending to the person from whom both are branched, and then by descending to the other to whom we do count, and it will appear in what degree they are. For example, in bro-thers' and sisters' sons, take one of them and ascend to his father, there is one degree ; from the father to the grandfather, that is the second degree : then descend from the grandfather to his son, that is the third degree ; then from his son to his son, that is the fourth. But the canonists do ever begin from the stock, namely, from the person from whom they do descend, of whose distance the question is. For example, if the question be, in what degree the sons of two brothers stand by the canon law, we must begin from the grandfather and descend to one son, that is one degree ; then descend to his son, that is another

degree: then descend from the grandfather to his other son, that is one degree; then descend to his son, that is a second degree: so in what degree either of them are distinct from the common stock, in the same degree they are distant between themselves; and if they be not equally distant, then we must observe another rule. In what degree the most remote is distant from the common stock, in the same degree they are distant between themselves: and so the most remote maketh the degree." Lord Coke, with his customary solicitude for the student, adds, " thus much of the civil and canon law is necessary to the knowledge of the common law in this point."

Our Intestate Act of 8th April 1833, after classifying certain lineal and collateral heirs of decedents, and prescribing the order of their succession to the real and personal estate, declares, in the 7th section, that in default of all persons hereinbefore described, the real and personal estate of the intestate shall descend to and be distributed among the *next of kin* of such intestate; and in the 11th section, next of kin are again referred to.

By which of the above rules of computation are we to ascertain the next of kin under this statute? We think it is abundantly evident, from the authorities cited by the auditor in his report, and especially from the observations of the codifiers on the 11th section of the act, that the " next of kin" are to be ascertained by the rules of the civil and not of the canon law.

Under the intestate laws which we had before the Act of 1833, it had been decided that in every case of descent not expressly provided for in the statues, the heir at common law should succeed to the real estate of the decedent in exclusion of others standing in the same degree of consanguinity. Thus, we were not only committed to the mode of computation which the common law had borrowed from the canonists, but our system of inheritance was deformed with the feudal features of primogeniture, and preference of males over females. The codifiers devised the 11th section to wipe out these odious features, and they said, "the provision that the next of kin shall take in every case not expressly enumerated, will, we believe, sufficiently identify the party, as the mode of computing kindred by the rules of the civil law is well understood and established." This was a clear recognition of the civil law rule of computation, and we are to presume that the legislature intended the next of kin should be ascertained according to it. As before intimated, it has always prevailed in determining the right of administration, and although it has been laid down that the statute of distribution in England must be construed according to the common law, the more modern cases seem to have fully established that its construction, as to proximity of degrees of kindred at least, shall be according to the rules of the civil law: 1 Williams's

9 WR.—28

Executors 364, and cases in notes. The rule of the common law, then, is limited, even in England, to the descent of real estate, and is retained, as to that, for reasons that grew out of their feudal tenures. We have rejected it both as to realty and personalty, and have adopted the more reasonable and just rule of the civilians.

By that rule there can be no doubt that the grandmother of the intestate is one degree nearer to him than the uncles and aunt, and that she is next of kin within the meaning of our Intestate Act. It is objected that she is not in the *descending* line from the intestate—an objection that would apply to the uncles as well as to her. The first canon of descent at common law is that inheritances shall lineally descend to the issue of the person who last died actually seised *in infinitum*, but shall never lineally ascend: 2 Black. Com., p. 208. Our Intestate Act alters this rule of the common law, and generally uses the word " descend" where lineal descendants or collateral kindred are to take the realty, the words " go to" being employed when lineal ancestors take. The word " distributed," as used in the statute, generally applies to the personalty; but in the 10th section of the Act of 1848, this word is applied to real estate of married women. In the 7th section of the Act of 1833, which relates both to realty and personalty, both words, " descend" and " distributed," are used in respect to the next of kin; and in the 11th section, the words are, " shall pass to and be enjoyed by the next of kin." These sections interpret each other. We are not to construe the word " descend" so strictly as to exclude a lineal ancestor, but as meaning a passing to such ancestor when he or she is next of kin. The fund here was distributable on this principle of construction.

The next question upon the record is, whether the grandmother was subject to the collateral inheritance tax, under the Act of 7th April 1826, Purdon 148. The only persons exempted from the operations of that statute are carefully enumerated. They are father, mother, husband, wife, children, and lineal descendents, born in lawful wedlock. Whoever else takes an estate of inheritance must suffer the tax. The argument here is that the case of a grandmother is *casus omissus*, but we cannot perceive the slightest ground for thinking the legislature meant to exempt her. It is true the act is called a " *collateral* inheritance" tax law, and that a grandmother is a lineal and not a collateral relative, but when the enacting clause of a statute embraces " all estate, real, personal, and mixed, of every kind whatsoever, passing from any person who may die seised or possessed of such estate," and then excepts only such takers of the estate as are enumerated in the excepting clause, it would be contrary to all rules of construction to enlarge the excepting at

[McDowell *v.* Addams *et al.*]

the expense of the enacting clause. "*Expressio unius, exclusio alterius*" applies here. We must presume the legislature enumerated all takers they meant to except. The occasion of the law was suggested by those oblique inheritances which we call collateral, which, though provided for by our intestate laws, are not the common course of estates, not the natural tendencies of property. When such exceptional instances should occur, the legislature deemed it fair to tax the lucky inheritors altogether beyond the usual rate of taxation, and hence this tax law. Grandmothers are unusual inheritors, even more so than uncles and aunts; and having enjoyed the chances of the two generations between which she stood, there would seem to be no especial reason why that which comes to her from the second generation below her should be exempt from public burthens. We think it is as clear that she is within the spirit and reason of the statute as she is within the letter.

As to the only other point, there can be no question that the corn was properly delivered to the heir. It was a growing crop at the death of the intestate, and was harvested and divided afterward, the tenant taking his part, and delivering to the heir the landlord's share. As a rent payable in kind, it passed with the inheritance, and belonged to the heir rather than the administrator.

These observations dispose of both appeals and affirm the decree below.