WILEY BRYANT ET AL. v. WASH BRYANT. .

(Filed 16 March, 1927.)

1. Estates—Entireties—Husband and Wife—Murder—Equity—Trusts.

Where husband and wife hold estate by entireties, and the husband has murdered the wife, and her expectancy of life has been legally determined to have been longer than his own, equity will decree that he hold the legal title to lands held by them in entireties in trust for her heirs at law until his death, subject to his right of management and the use of the rents and profits for his own life. C. S., 2522, is not applicable.

BRYANT v. BRYANT.

**2. Same—Injunctions.**

Where a husband has murdered his wife, and is attempting to sell lands held by them in entireties and to convey the legal title under the principle of survivorship, equity will afford injunctive relief in favor of the wife's heirs at law, for whom he holds as trustee.

APPEAL by defendant from a final judgment signed by *Cranmer, J.,* in Johnston County, in an action pending in the county of HARNETT. The parties consented that the judge should find the facts upon the pleadings and the admissions of the parties and render a final judgment in the cause out of term and outside the county in which the action was pending. The facts are as follows:

1. The plaintiffs are the children of the defendant, Wash Bryant, and his late wife, Ida Bryant, who died on 12 January, 1920.

2. On 14 February, 1913, W. W. Scott and wife conveyed to Wash Bryant and wife, Ida Bryant, one hundred and thirteen acres of land located in Harnett County, North Carolina, by deed which has been duly registered in Book 177, page 506, which deed and the said record thereof are made a part of this finding of fact for full description of the land so conveyed and under said deed. The land was held by said husband and wife as tenants by entireties up to the date of the death of said Ida Bryant.

3. Said Ida Bryant was feloniously murdered and slain on 12 January, 1920, by her husband, Wash Bryant, defendant herein.

4. Said Wash Bryant was convicted of the murder of his wife at the September Term, 1923, of Harnett Superior Court, being convicted of murder in the second degree, and is now serving a term in the State prison on account of same.

5. At the time of the death of said Ida Bryant she was in good health, was younger than her husband, was free from dissipation, while her husband was addicted to the use of strong drink, and under the mortuary table she had a longer expectancy of life than her husband.

6. The defendant, Wash Bryant, at the institution of this action and the granting of the temporary restraining order herein had employed an auction company and was offering said tract of land for sale, claiming to be seized thereof in fee simple.

Upon these facts it was adjudged that the defendant holds the legal title to the land conveyed to him and his wife in trust for the benefit of the plaintiffs, his heirs at law, and that they are the equitable owners and entitled to the actual possession thereof freed and discharged from the claims of the defendant; that the defendant convey the land to the plaintiffs, and upon failure to do so that the judgment should be registered in the office of the register of deeds of Harnett County, and should

operate as such conveyance; and that the defendant account to the plaintiffs for the rents and profits received by him. The cause was retained for a statement of the account. The defendant, assigning error, excepted and appealed. Modified and affirmed.

*Clawson L. Williams, Clifford & Townsend, and Young & Young for plaintiffs.*
*H. L. Godwin for defendant.*

ADAMS, J. The deed executed by W. W. Scott and his wife on 14 February, 1913, conveyed to the defendant and his wife an estate by entireties. When the defendant put his wife to death, to what extent did his felonious act affect his interest in the land? This is the question proposed for solution.

A review of the cases involving the legal effect of felonious homicide upon the title claimed by the slayer to the property of the deceased discloses three lines of argument: (1) The legal title does not pass to the murderer as heir or devisee; (2) the legal title passes to the murderer and may be retained by him in spite of his crime; (3) the legal title passes to the murderer, but equity will treat him as a constructive trustee of the title because of the unconscionable mode of its acquisition, and compel him to convey it to the heirs of the deceased, exclusive of the murderer. Ames, Lectures on Legal History, 311.

The first of these positions was maintained in *Riggs v. Palmer,* 115 N. Y., 506, and in *Shellenberger v. Ransom,* 31 Nebraska, 61. In the *Riggs case* the facts were that Francis B. Palmer made his will in which he gave small legacies to his two daughters, the plaintiffs in the action, and the remainder to his grandson, the defendant, subject to the support of his mother, with a gift over to the two daughters, subject to the support of the mother, in case the grandson should die under age, unmarried, and without issue. The grandson, sixteen years of age, lived with the testator as a member of his family, and to prevent a revocation of the will took the life of the testator by means of poison. The Court held that the legal title did not pass to the defendant; that by reason of his crime he was deprived of any interest in the devise, and that he should be enjoined from using any part of the estate left him by the testator. The holding that no legal title passed and that the defendant had no interest in the devise was criticised; and a few years afterwards in *Ellerson v. Westcott,* 148 N. Y., 149, the Court of Appeals said that *Riggs v. Palmer* must not be interpreted as holding that the will was revoked; that instead of being revoked and made inoperative by reason of the crime the devise took effect and transferred the legal title, the relief to which the plaintiffs were entitled being equitable and injunc-

tive. In the exercise of its equitable jurisdiction the court declared that the devisee should not retain and enjoy his ill-acquired title.

In *Shellenberger v. Ransom, supra,* the question was whether Leander Shellenberger, who wilfully took the life of his daughter for the purpose of getting her property, acquired title to her estate, the facts being that she died intestate and that except for his crime he would have taken her estate by inheritance. The Court, following *Riggs v. Palmer, supra,* said that Leander Shellenberger took no estate from his daughter and that her title passed to her brother. Upon a rehearing this decision was reversed, and it was held that the title to the daughter's estate vested in the criminal by operation of law and was dependent upon no condition, not even his acceptance. *Shellenberger v. Ransom,* 41 Neb., 631. Referring to these two cases it has been said: "Unfortunately the second opinion was more unsatisfactory than the first. For, although both disregarded legal principles, the first was against, while the second was in favor of the murderer." Ames, *supra,* 312, note.

Among the cases which sustain the position that the legal title vests in the murderer and may be retained by him despite his crime, are *Shellenberger v. Ransom, supra,* decided on the rehearing; *Deem v. Milliken,* 6 Ohio, C. C., 357; and *In re Carpenter's Estate,* 170 Pa., 203, 32 At., 637. In the case last cited it was shown that James Carpenter was murdered by his son so that the son might get immediate possession of the father's estate under the statute of distributions. After the commission of the crime the son and the widow, who had become an accessory after the fact, conveyed their interest in the property to the attorney who defended them in the prosecution for murder. The collateral heirs of the decedent contended that neither the mother nor the son under these circumstances had a beneficial interest in the estate.

The Supreme Court, disallowing the claim of the collateral heirs, arrived at its conclusion upon the following reasoning: "The Legislature has never imposed any penalty of corruption of blood or forfeiture of estate for the crime of murder, and therefore no such penalty has any legal existence. In the case now under consideration it is asked by the appellant that this Court shall decree that in case of the murder of a father by his son the inheritable quality of the son's blood shall be taken from him, and that his estate, under the statute of distributions, shall be forfeited to others. We are unwilling to make any such decree, for the plain reason that we have no lawful power so to do. The intestate law in the plainest words designates the persons who shall succeed to the estates of deceased intestates. It is impossible for the courts to designate any different persons to take such estates without violating the law. . . . It is argued, however, that it would be contrary to public policy to allow a parricide to inherit his father's estate. Where is the

authority for such a contention? How can such a proposition be maintained when there is a positive statute which disposes of the whole subject? How can there be a public policy leading to one conclusion when there is a positive statute which disposes of the whole subject? How can there be a public policy leading to one conclusion when there is a positive statute directing a precisely opposite conclusion? In other words, when the imperative language of a statute prescribes that upon the death of a person his estate shall vest in his children, in the absence of a will, how can any doctrine, or principle, or other thing, called 'public policy,' take away the estate of a child, and give it to some other person? The intestate law casts the estate upon certain designated persons, and this is absolute and peremptory; and the estate cannot be diverted from those persons, and given to other persons, without violating the statute. There can be no public policy which contravenes the positive language of a statute."

In the opinion the Court cites *Owens v. Owens,* 100 N. C., 242, to which we shall hereafter refer, *Shellenberger v. Ransom, supra, Riggs v. Palmer, supra,* and noting a distinction between descent and a devise, which involves the operation of a private grant, differentiates *Insurance Co. v. Armstrong,* 117 U. S., 591, 29 Law Ed., 997, and *Cleaver v. Association,* 1 Q. B., 147, as decisions based entirely upon the ground of fraud perpetrated in breach of contract rights.

But if we concede as a matter of law that the doctrine of public policy cannot affect the imperative language of a statute which directs the course of descent, we are confronted with the question whether this or any other doctrine prevents the application of the familiar equitable principle that, when the legal title passes in case of descent or devise, the wrongdoer may be treated as a constructive trustee of the title he has unlawfully acquired. To this question, in our opinion, a negative answer must be given.

The scope of constructive trusts is thus outlined by Pomeroy: "Constructive trusts include all those instances in which a trust is raised by the doctrines of equity for the purpose of working out justice in the most efficient manner where there is no intention of the parties to create such a relation, and in most cases contrary to the intention of the one holding the legal title, and where there is no express or implied, written or verbal, declaration of the trust. They arise when the legal title to property is obtained by a person in violation, expressed or implied, of some duty owed to the one who is equitably entitled, and when the property thus obtained is held in hostility to his beneficial rights of ownership. As the trusts of this class are imposed by equity, contrary to the trustee's intention and will, upon property in his hands, they are often termed trusts *in invitum;* and this phrase furnishes a criterion

generally accurate and sufficient for determining what trusts are truly 'constructive.' An exhaustive analysis would show, I think, that all instances of constructive trusts properly so called may be referred to what equity denominates fraud, either actual or constructive, as an essential element, and as their final source. . . . This notion of fraud enters into the conception in all its possible degrees. Certain species of the constructive trusts arise from actual fraud; many others spring from the violation of some positive fiduciary obligation; in all the remaining instances there is, latent perhaps, but none the less real, the necessary element of that unconscientious conduct which equity calls constructive fraud." 3 Pomeroy's Eq. Jurisprudence, sec. 1044.

After saying that if the legal title to property has been obtained through actual fraud, undue influence, or duress, or under any other similar circumstances which render it unconscientious for the holder of the legal title to retain and enjoy the beneficial interest, equity impresses a constructive trust on the property thus acquired in favor of the one who is truly and equitably entitled to it, although he may never have had the legal estate, the author proceeds: "The forms and varieties of these trusts, which are termed *ex maleficio* or *ex delicto,* are practically without limit. The principle is applied wherever it is necessary for the obtaining of complete justice, although the law may also give the remedy of damages against the wrongdoer." *Ibid.,* sec. 1053. And with respect to a devise or bequest procured by fraud it is said: "It is astonishing that the numerous cases holding that no exception can be made to the statutes of wills or of descent for the case where the testator or ancestor is murdered by his devisee, legatee or heir, have overlooked the plain analogy to the principle of the above paragraph. Unfortunately, the opinions in most of those cases show no evidence that this analogy was considered by the court, or even brought to the court's attention. That the principle should be applied in this class of cases, and the criminal held a constructive trustee of the fruits of his crime seems too plain for argument. See *Wellner v. Eckstein,* 105 Minn., 444, 117 N. W., 830 (opinion by *Elliott, J.); Perry v. Strawbridge,* 209 Mo., 621, 123 A. S. R., 510, 14 Ann. Cas., 92, 16 L. R. A. (N. S.), 244, 108 S. W., 641. For a typical case ignoring the equitable view, see *McAllister v. Fair,* 72 Kan., 533, 115 A. S. R., 233, 7 Ann. Cas., 973, 3 L. R. A. (N. S.), 726, and note, 84 Pac., 112." *Ibid.,* sec. 1054, note b, p. 2411. Several of the "typical cases" were cited and reviewed in 34 Am. Law Register, page 636.

The equitable doctrine is this: As a question of common law the homicide does not prevent the legal title from passing to the criminal as the heir or devisee of his victim, but equity, acting *in personam,* compels the wrongdoer who has acquired the *res,* to hold it as a con-

structive trustee of the person wronged, or of his representatives,· if he be dead;· and this result follows although the homicide may not have been committed for the express purpose of acquiring title, if by reason of the homicide the title would have passed to the criminal under· the common law. This, we think, is the principle which should be applied in the case before us; it not only makes unnecessary the attempted distinction between cases of devise or bequest and cases of descent; it obviates the reproach of permitting an atrocious criminal to profit by his perfidy. See 30 A. L. Review, 130; 4 Harvard L. Review, 394.

It is altogether reasonable that the appellant should rely upon the decision in *Owens v. Owens,* 100 N. C., 240, for it was cited by the Supreme Court of Pennsylvania in support of the conclusion reached in the *Carpenter case. In re Carpenter's Estate, supra.* In the *Owens case* the question was whether the criminal act of participating in the murder of her husband deprived the widow of her right to have dower allotted in the estate of which he had died seized, and it was held that it did not. It is apparent, however, that the appeal was treated as presenting nothing more than a question of law, in reference to which the Court said as the law gives dower and makes no provision for its forfeiture for crime, adultery being the only bar (The Code, sec. 1844), no obstacle stood in the way of the widow's seeking what the law had given. There is an intimation that she was entitled to share in the personal estate of her husband as a distributee; but this also was dealt with as a question of law. The Court remarked, "We have searched in vain for an authority or ruling on the question and we find no adjudged· case." It does not appear what the decision would have been if the equitable jurisdiction of the court had been invoked for the administration of the doctrine to which we have adverted; for as suggested by Pomery, this is one of those cases in which the equitable principle was not brought to the attention of the Court.

If the doctrine is applicable, how does it affect the appellant's title? The answer depends upon the nature of an estate by entireties. In such case by a legal fiction the husband and wife hold the title as one person. Whenever the fictitious unity of person is severed by the death of either the survivor has the title, the deceased leaving no interest which is descendible or devisable. During its continuance neither the husband nor the wife can convey or encumber the estate so as to destroy the ·right of the survivor, but the husband has the control and use of the property and is entitled to the possession, income, and usufruct thereof during their joint lives. *Bruce v. Nicholson,* 109 N. C., 204; *Bank v. McEwen,* 160 N. C., 414; *Dorsey v. Kirkland,* 177 N. C., 520; *Davis v. Bass,* 188 N. C., 200. It is therefore manifest that if the deceased wife were now living the appellant could not be deprived of his interest in

the estate by an arbitrary judgment of the court. None the less is he entitled to the enjoyment of such interest after her death; but for the benefit of her heirs at law a court of equity will interpose its protecting shield. This principle is illustrated by Ames, *supra,* 321: "Similar reasoning would be applicable if land bought by B. and C. had been conveyed to them as joint tenants in fee simple, and C. were then to murder B. Each joint tenant has a vested interest in a moiety of the land so long as he lives, and a contingent right to the whole upon surviving his fellow. The vested interest of C., the murderer, cannot be taken from him even by a court of equity. But C. having by his crime taken away B.'s vested interest must hold that as a constructive trustee for the heir of B."

In the application of this principle a court of equity will not deprive the appellant of his interest in the estate, but the appellant by his crime took away his wife's interest, and as to this he must be held a constructive trustee for the benefit of her heirs, the judge in effect having found as a fact that the deceased would have survived him. Even in the absence of such finding, equity would probably give the victim's representatives the benefit of the doubt. Ames, *supra,* 321.

Our conclusion is that the appellant holds the interest of his deceased wife in the property as a trustee for her heirs at law; that he should be perpetually enjoined from conveying the property in fee; that the plaintiffs should be adjudged the sole owners, upon the appellant's death, of the entire property as the heirs of their deceased mother; and that the judgment as thus modified should be affirmed.

As our decision is based upon equitable principles, it is not necessary to determine whether the provisions of C. S., 2522, in reference to the felonious slaying of the husband or wife, which was enacted after the decision in *Owens v. Owens, supra,* embraces estates held by entireties. Laws 1889, ch. 499.

Modified and affirmed.