## Tarlo's Estate.

Argued December 1, 1933. Before FRAZER, C. J., SIMPSON, KEPHART, SCHAFFER, MAXEY, DREW and LINN, JJ.

322

*Mercer B. Tate, Jr.,* of *Montgomery & McCracken,* for appellant.—The estate of Albert Tarlo should not inherit, because such a result permits a wrongdoer to profit by his own wrong against the expressed policy of the Commonwealth.

The legislature used the word "adjudged"; it did not use the word "convicted." It means to determine, to ascertain, to investigate and to decide by judicial determination; it means to adjudicate. It is a word of civil jurisprudence and not of criminal jurisprudence.

Courts may not resort to views expressed by those who either draft or enact laws, for the purpose of determining the meaning of the words employed therein.

*Charles Hunsicker,* with him *Charles Hunsicker, Jr.,* for appellee.—The words of the statute being plain, unambiguous and positive, there is no occasion to resort to rules of statutory interpretation and construction: F. K. Market House Co., Inc., v. Reading, 310 Pa. 493.

Section 23 of the Intestate Act of 1917 being in its nature penal, it must be strictly construed: Walnut Coal Co. v. R. R. Co., 237 Pa. 410.

The words "finally adjudged" are used in their technical sense and can mean only that the sentence after conviction of a competent court created by law to try crimes is affirmed by the Supreme Court upon appeal.

OPINION BY MR. JUSTICE SCHAFFER, April 23, 1934:

Albert Tarlo arose early on the morning of November 27, 1930, fired one shot into the brain of his wife, who was asleep in the same room, proceeded to the bedroom of his sleeping daughter and shot her in the same way, and then turned the pistol on his own head. The wife and daughter died instantly in their sleep. He survived for a few hours. The daughter left no will. The question before us is whether her estate shall be distributed to the administrator of her father, or to her maternal grandfather, Louis Koch, who is her next of kin if the inheritance may not pass through her father. The orphans' court awarded the property to the administrator of the father. Louis Koch has appealed.

Full and most complete briefs have been submitted to us in which the general policy of the law and decisions from many jurisdictions have been discussed and analyzed. As we see it, however, the question to be decided lies in a very narrow field, that embraced by the language of section 23 of the Intestate Act approved June 7, 1917, P. L. 429, 20 P. S. 136, which reads as follows: "No person who shall be finally adjudged guilty, either as principal or accessory, of murder of the first or second degree, shall be entitled to inherit or take any part of the real or personal estate of the person killed, as surviving spouse, heir, or next of kin to such person under the provisions of this act." With the section in view, it is quite apparent that the field of inquiry is further limited to the meaning of but one of its words, "adjudged." Does it connote final conviction in the court of oyer and terminer? If it does, then of course there can be no blocking of the usual course of descent as the killer was not tried and convicted. His suicide prevented this.

We are of the opinion that the language used in the section is that of the criminal law and that the expression "shall be finally adjudged guilty" means the judgment of a court of competent jurisdiction to pass on the question of guilt in murder, the court of oyer and ter-

miner; that the word "adjudged" as used in the statute is the equivalent of "convicted and sentenced." "The word 'adjudged' as used in Rev. St. [of New York], article II, page 68, section 1, declaring that every person who shall wilfully swear falsely shall, on conviction, be 'adjudged' guilty of perjury, and shall not thereafter be received as a witness in any cause, is synonymous with 'convicted'; and hence a verdict finding one guilty of perjury does not disqualify him as a witness until sentence has been pronounced thereon": Words & Phrases, 1st Series, volume 1, page 192, citing Blaufus v. People, 69 N. Y. 107, 111, 25 Am. Rep. 148. See also Searight v. Com., 13 S. & R. 301, Gibson, J. There must be not only a conviction, but judgment of the court and the judgment in criminal cases is the sentence. "Finally adjudged" means convicted and sentenced and the sentence not appealed, or, if appealed, that the judgment of sentence has been affirmed.

While it is true that the views expressed by those who draft or enact laws are not a safe guide when the courts are called upon to determine the meaning of the words employed therein (Cumberland v. Boyd, 113 Pa. 52; Lenhart v. Cambria Co., 29 Pa. Superior Ct. 350; Hood Rubber Co. v. Commissioner of Corporations and Taxation, 268 Mass. 355; Lapina v. Williams, 232 U. S. 78, 90; Gasoline Products Co. v. Champlin Co., 283 U. S. 494), yet in order to get at the old law, the mischief and the remedy and properly to understand and construe a statute embodying the latter, the history of the enactment in question may always be considered: Miles's Est., 272 Pa. 329, 339; Com. v. Quaker City Cab Co., 287 Pa. 161, 169; Orlosky v. Haskell, 304 Pa. 57, 66. In Miles's Est., it was pointed out that the United States Supreme Court in Duplex Printing Press Co. v. Deering, 254 U. S. 443, determined that the report of a committee, having a bill in charge during its passage "may be regarded [judicially] as an exposition of the legislative intent in a case where otherwise the meaning of a statute is

obscure." In that case, the Supreme Court said (page 474) : "By repeated decisions of this court it has come to be well established that the debates in congress expressive of the views and motives of individual members are not a safe guide, and hence may not be resorted to, in ascertaining the meaning and purpose of the law-making body. ...... But reports of committees of house or senate stand upon a more solid footing, and may be regarded as an exposition of the legislative intent in a case where otherwise the meaning of a statute is obscure." To the same effect are McDowell v. Addams, 45 Pa. 430; Whitaker's Est., 175 Pa. 139; Binns v. U. S., 194 U. S. 486.

The report of a commission appointed to codify the law upon a given subject is entitled to even greater weight than the report of a committee; especially is this so where the legislature enacts the exact language of the commission's draft. The act which we are considering was the result of the study and recommendation of an able commission appointed by the governor of the Commonwealth. Section 23 is in the exact language of their recommendation. In their report (page 47) they say: "This is a new section framed to meet the situation presented in Carpenter's Est., 170 Pa. 203. In that case, a son killed his father, was convicted of murder and was executed therefor. His mother, the widow of the intestate, was convicted as an accessory after the fact and duly sentenced. The motive of the crime was to get possession of the estate of the decedent, and the Supreme Court was constrained to hold that the criminals had not forfeited their rights under the intestate law. ...... The commissioners are of opinion however that the guilt of the party charged with the crime should be determined by his conviction in the proper forum." It is impossible to conclude that the legislature in approving the language of the section as the commission had drafted it did not do so with the intent that it should have the effect which the commission designed and pointed out to

the law makers. To give it a wider effect by our saying that in using the words "adjudged guilty" the legislature meant more than the commission intended and meant "adjudged guilty" by the orphans' court, as appellant contends, would be to close our eyes to the obvious when everything points the other way. If the law is to be changed so as to cover the situation before us, it is for the legislature to make the change, not for us.

The decree is affirmed at appellant's cost.

CONCURRING OPINION BY MR. JUSTICE DREW:

I feel compelled, rather unwillingly, to arrive at the conclusion that the decree of the court below is right and must be affirmed. I think it impossible, on legal grounds, to reach any other conclusion. The language of section 23 of the Intestate Act of 1917 is too plain. When considered in the light of the law as declared by us in Carpenter's Est., 170 Pa. 203, which has been changed only to the extent expressed clearly and unequivocally in the act, the conclusion is inevitable that except in the case of one "finally adjudged guilty, either as principal or accessory, of murder of the first or second degree," our statute regulating descent and distribution is adamant, and we are powerless to change the course of descent from that expressed therein. As we said in that case, "The intestate law in the plainest words designates the persons who shall succeed to the estates of deceased intestates. It is impossible for the courts to designate any different persons to take such estates without violating the law. We have no possible warrant for doing so." That case has never been overruled, and is the law of the Commonwealth today, except in the one respect changed by the act. As we have seen, that change affects only inheritance by one "finally adjudged guilty......of murder," which certainly means after trial, conviction, and final judgment in a court of oyer and terminer; and, by the same token, it certainly does not affect the inheritance of one not so adjudged guilty of murder. We have

not the power to set aside the plain mandate of the statute of descent, and we would do that if, for any reason, we wrote into it a course of descent other than that provided therein. Without overruling the principle expressed in Carpenter's Estate, which I have quoted above, and doing violence to the statute of descent, the device of a constructive trust cannot be employed.

For these reasons I agree with the majority that the decree of the court below should be affirmed, hoping that the legislature in its wisdom will so change the law that, on facts such as those which have caused our division, the question of guilt will be submitted to and determined by a jury.

DISSENTING OPINION BY MR. CHIEF JUSTICE FRAZER:

In Carpenter's Est., 170 Pa. 203, this court held that a son who unlawfully killed his father was entitled under the intestate laws to participate in the distribution of the father's estate. The decision was later followed by section 23 of the Intestate Act of 1917, which provides as follows: "No person who shall be finally *adjudged* guilty, either as principal or accessory, of murder in the first or second degree, shall be entitled to inherit or take any part of the real or personal estate of the person killed, as surviving spouse, heir or next of kin to such person under the provisions of this act." In my opinion, Carpenter's Estate is the law today and should be followed except to the extent changed as indicated in the Act of 1917. While the language of the Act of 1917 is somewhat uncertain the intention of its framers should be ascertained by "rational interpretation" of its provisions; applying this rule to the situation before us, it seems to me that under the legislation in question, in adjudicating estates of murdered persons, the killer should be "finally adjudged guilty [of the killing], either as principal or accessory," by the tribunal having jurisdiction in such cases, before his next of kin can be barred from participating in the distribution of the es-

tate of his victim. As I read the act, its provisions do not require that the killer be convicted of murder in the court of oyer and terminer, as this would be impossible in many cases, especially the one now before us, as here the offender died by his own hand within a few hours following the killing. We should assume the legislature did not intend the Act of 1917 to be of little or no effect or its provisions to be applicable only in cases where conviction is had in the court of oyer and terminer; what it undoubtedly intended was that the circumstances of each particular case should be "adjudged," that is, decided and determined in a competent tribunal, either civil or criminal as the situation demands. In this case, in my opinion, the orphans' court, in adjudicating distribution of the deceased's estate, is the proper tribunal to determine the parties entitled to participate in the distribution. If the killer had survived and been convicted, and sentenced in the court of oyer and terminer for murder of the first or second degree or accessory, that conviction would be conclusive in determining the right of those entitled to participate in the distribution. Here, the offender's suicide immediately following the killing precludes a trial in the court of oyer and terminer, and if the legislation is to have any bearing on cases of this character, its provisions require the right of those claiming to participate in the distribution of the decedent's estate to be passed upon by a proper tribunal. That he took the life of his daughter is not disputed. Do the circumstances surrounding the unfortunate occurrence establish the elements necessary to sustain murder of either first or second degree or accessory? If they do and the father is, after hearing testimony, adjudged to have been sane at the time of committing the deed, his next of kin is not entitled to inherit; if, on the contrary, he was insane and as a result of that condition or because of some other legal reason not chargeable for his act, the next of kin should participate in the distribution under the intestate laws. The question of the

killer's responsibility should, under the situation here before us, be determined by the orphans' court and distribution made in accordance with the finding supported by the testimony after full hearing.

I would remit this case for further hearing and disposition as herein indicated.

DISSENTING OPINION BY MR. JUSTICE KEPHART:

The record shows an unlawful killing and the majority opinion fully sets forth the facts, which raise but one question: Can a murderer profit from the estate of his victim? The majority opinion decides that he can. I do not agree with that conclusion.

The question is not new in this or other states; many conflicting decisions have answered it. One group, to stop such a flagrant injustice as to permit an atrocious criminal to enrich himself by his crime, adhere to the fundamental principle of equity that no one shall be permitted to profit by his own fraud, to take advantage of his own wrong, or to enjoy the fruits of his iniquity, and holds that the enjoyment of property, whether by will, or under the statutes of descent, or through contracts such as life insurance policies, procured through crime, must be subjected to the scrutiny of this universally recognized principle of morality, equity and justice. As a matter of public policy, equity will interpose to prevent such unconscionable modes of acquiring property. It is unnecessary to detail the many instances and varying circumstances in which these maxims have been applied; the reader is referred to authorities and writers hereinafter mentioned for further exposition.

The opposite view of a few states is that the force of this principle has been terminated and denied further effect by the legislature which created a new and different public policy in the enactment of statutes determining the descent and distribution of property at death; but no statute anywhere has ever expressed such a thought. The conclusion in every instance is but an in-

ference of the particular court reached because the statute under review has not expressed the opposite conclusion.

An examination of the statutes and decisions of this Commonwealth on kindred questions, reveals not only no impediment to, but a definite and distinct expression of a policy which is contrary to the result reached in the majority opinion.

The court below and the majority must rely on Carpenter's Est., 170 Pa. 203, as the Intestate Act, hereinafter discussed, does not help. In that case a son, motivated by the desire to acquire his father's property, and conniving with his mother, murdered his father. The son was convicted of murder and hanged. The mother was convicted as an accessory before the fact. The collateral kinsmen of the father claimed the son had forfeited any interest he had in his father's estate, and that they were therefore entitled to inherit. This court held on two grounds [Justice WILLIAMS dissenting], that the son had not forfeited his right to inherit, regardless of the means by which he inherited, because: 1st. Under article I, section 18 and section 19, of the declaration of rights, it is provided that "no person shall be attainted by treason or felony *by the legislature*" and that "no attainder shall work corruption of blood, nor, except during the life of the offender, forfeiture of estate *to the Commonwealth.*" It is apparent that the court erred in using this reason as a basis for its opinion, since there can be no forfeiture of an estate of which one has not yet come into possession, nor was there in that case, nor is there in this, any question of "forfeiture of estate *to the Commonwealth.*" Moreover, such provisions, indubitably apply to the estate in the possession of the one guilty of the treason or felony at the time he commits the act, and do not govern the question of the transmission to or through him of other interests or estates thereafter: Price v. Hitaffer, 165 Atl. 470 [Md. 1933].

The second reason given was that "the Intestate Law in the plainest words designates the persons who shall succeed to the estates of deceased intestates. It is impossible for the courts to designate any different persons to take such estates without violating the law." Justice GREEN, in meeting the argument that it was against public policy to permit a murderer to profit by his crime, stated that there could be no public policy directly in opposition to a positive statute on the subject. There was, however, no "positive statute on the subject," but only an inference by the court. Upon such legalistic reasoning as that stated, without regard to the fundamental principles and concepts of equity which this court had prior thereto often announced and applied to prevent the consummation of fraud, duress, undue influence, and other analogous situations, the decision was reached. It was necessarily followed by the Superior Court, of course, without discussion, in Johnson's Est., 29 Pa. Superior Ct. 255. It may be remarked that Justice GREEN relied on Owens v. Owens, 100 N. C. 242, where homicide did not prevent the wrongdoer from participating in his victim's estate. Thereafter the cases of Bryant v. Bryant, 193 N. C. 372, and Parker v. Potter, 200 N. C. 348, were decided, overruled Owens v. Owens, supra, and held the word "convicted" in a statute did not mean a trial in the criminal court.

The natural result of the unjust and inequitable decision in Carpenter's Est., supra, was section 23 of the Intestate Act of June 7, 1917, P. L. 429, which provided: "No person who shall be finally adjudged guilty, either as principal or accessory, of murder of the first or second degree, shall be entitled to inherit or take any part of the real or personal estate of the person killed, as surviving spouse, heir, or next of kin to such person under the provisions of this act." The title to the estate would not pass to the murderer as an heir, spouse or next of kin. The act dealt with descent only.

The legislature, however, enacted this section with Carpenter's Est., supra, in mind. It was advisedly overruling the reasoning of that decision; it wiped out and completely destroyed its effect and declared as the policy of the Commonwealth the principle that those found guilty of murder shall not profit by their wrong and inherit from their victims. This policy is the reverse of that stated in the court's opinion in Carpenter's Est., supra.

We need not discuss the intention of the legislature in using the word, "adjudged," and we may accept for our present purpose the conclusion of the lower court and the majority as to that intention, but such determination wholly neglects the substance of the problem before us. While it was of course the function of the legislature to declare the public policy as it related to inheritance resulting from murder, the mere fact that the legislature set aside the public policy announced in Carpenter's Estate and declared a new policy as to inheritance by those "adjudged guilty" of murder, does not prevent us in those cases which may fall outside the statute from considering, under the principles of equity and common law, the legal effect of murder on the transmission of title to the property of the deceased. The legislature did not declare that murderers who *were not "adjudged guilty"* should profit by the crime.

The function of courts is to execute the policy enunciated by the legislature within the specific spheres covered by the act, but such legislative expressions, unless intended to do so, do not preclude this court from considering the entire subject-matter not covered by the act, and we may review anew under equitable and common law principles the question involved, unfettered by precedent or statute.

In considering the various situations involving the procurement and enjoyment of property as the result of murder, the court must envisage not merely the commands of the common and statutory law, but must

hearken to the dictates of conscience where fraud, force or crime appear, and, depending on the strong arm of equity acting in personam, compel the perpetrator of the crime to surrender that to which at law, whether statutory or unwritten, he has acquired title. The legislature has expressed the public policy in section 23 of the Intestate Act, supra, and as it relates to wills in the Act of June 7, 1917, P. L. 403, section 22. It has there pointed the way for our action in the cases not coming within the statutory terms.

It is not the province of equity to administer the criminal law but to secure restitution to a person wronged, by compelling the wrongdoer to give up the fruits of his misconduct to the extent to which he was benefited by such misconduct or to the closest approximation to complete justice. On principle, it is apparent that a court of conscience must, if possible, intervene to prevent a murderer from enjoying the property of his victim,—a result so sordid and so abhorrent to all principles of fairness and right. This may be done by the application of the well established and frequently employed equitable doctrine or principle that no person shall be permitted to profit or be unjustly enriched as the result of unlawful acts committed by him. All laws as well as contracts may be controlled in their operation and effect by the general fundamental concepts of equity and the common law. As stated by FRY, L. J., in Cleaver v. Mutual Reserve, etc., Assn. (1892), 1 Q. B. 147, 156: "It appears to me that no system of jurisprudence can with reason include, amongst the rights which it enforces, rights directly resulting to the person asserting them from the crime of that person. If no action can arise from fraud, it seems impossible to suppose that it can arise from felony or misdemeanor." It is uniformly stated that no one shall be permitted to profit by his own fraud, to take advantage of his own wrong, to found any claim upon his own iniquity, or to acquire property by his own crime. These are not new, novel, or untried

principles, but are constantly applied by this court under its great equity powers. No interference with the operation of the law of intestacy, descent and wills is involved. The title under the law passes to the wrongdoer, but, to prevent him from being unjustly enriched as a result of his crime, chancery compels him to hold the property he has thus received as constructive trustee for the benefit, use and enjoyment of those whom by his act he has attempted to cheat, and there being no legal or equitable reason for continuing such a trust, may decree it ended and give the estate to those beneficially interested.

While the authorities on this subject reveal a considerable division, the weight of opinion is decidedly against permitting the wrongdoer to reap the harvest of his evil, and to cheat justice by suicide: New York Mutual Life Ins. Co. v. Armstrong, 117 U. S. 591; Price v. Hitaffer, supra; Slocum v. Metropolitan Life Ins. Co., 245 Mass. 565; Perry v. Strawbridge, 209 Mo. 621; Riggs v. Palmer, 115 N. Y. 506; Ellerson v. Westcott, 148 N. Y. 149; Parker v. Potter, supra; Bryant v. Bryant, supra; Box v. Lanier, 112 Tenn. 393; In re Tyler, 140 Wash. 679; In re Wilkins, 192 Wis. 111; Cleaver v. Mutual Reserve, etc., Assn., supra; Crippen's Est., 1911 Probate R. 108; Hall's Est., 1914 Probate R. 1; Lundy v. Lundy, 24 Can. Sup. Ct. 650. See Ames Lectures on Legal History 310; 30 Harvard L. R. 622; 29 Michigan L. R. 745 (1931); 64 Univ. of Pa. L. R. 307; 30 Law Quarterly Review 320 (1931); 6 Cincinnati L. R. 469 (1932); Virginia L. R., March, 1933, page 518; Cardozo, "The Nature of Judicial Process," page 40.

To discuss in detail these numerous authorities would only reinforce what I have already said. They reveal the growing conviction not only of courts but also of legal scholars that the logic and power of the principle that no man shall profit from his own iniquity or take advantage of his own wrong, is sufficient to compel the wrongdoer who takes legal title under the statutes of de-

scent and distribution, to hold that bare, naked, legal title as trustee for the heirs or personal representatives of his victim.

For the reasons above given, I dissent from the opinion and judgment of the majority, and would reverse the decree of the orphans' court.

Mr. Justice SIMPSON concurred in this dissent.