Baysic **GALLIMORE**, Appellant,

v.

Doris M. **WASHINGTON**,
et al., Appellees.

No. 94–CV–814.

District of Columbia Court of Appeals.

Argued May 30, 1995.
Decided Oct. 23, 1995.

---

Raighne C. Delaney, Student Attorney (No. 6963), and Peter H. Meyers, Supervising Attorney, with whom Joan Strand, Supervising Attorney, Washington, DC, was on the brief, for appellant.

Matthew A. Kane, Bethesda, MD, for appellees.

Before SCHWELB and RUIZ, Associate Judges, and MACK, Senior Judge.

Opinion for the court by Associate Judge RUIZ.

Dissenting opinion by Associate Judge SCHWELB at p. 1211.

RUIZ, Associate Judge:

Appellant Baysic Gallimore was convicted of murdering appellees' mother, Annie Mae Washington. At the time of her death, Washington and Gallimore were joint owners of an improved lot in the District of Columbia. After Gallimore's conviction, appellees brought this action to quiet title, seeking a judgment declaring that they exclusively own the lot as tenants in common, free of claims by Gallimore. On cross-motions for summary judgment, the trial court granted appellees the relief they sought, holding that because Gallimore was convicted of murdering his joint tenant, D.C.Code § 19–320(a) (1990)[1] operated to divest him of all his interest in the property he held jointly with decedent as if he had predeceased her. *Washington v. Gallimore,* 122 Daily Wash. L.Rptr. 1125 (D.C.Super.Ct. May 18, 1994).

We reverse. We need not decide whether § 19–320 applies to these facts because we hold that the common law, at least with respect to the present problem, is not displaced by the statute and that the result under the statute and the common law would be the same. Neither permits a joint tenant with right of survivorship to enrich himself by murdering his co-tenant. Neither, however, would work a forfeiture of a murderer's *preexisting* property interest as the result of his conviction. Therefore, we hold that when Gallimore murdered Washington, the joint tenancy with right of survivorship was converted by operation of law to a tenancy in common—the interest that most closely resembles the interest that Gallimore owned while Washington was alive—with Washington's corresponding share as tenant in common passing to her estate.

**I.**

The relevant facts are undisputed. Washington was still married (separated but never divorced) to someone else when she participated in a marriage ceremony with Gallimore and they began to live together as husband and wife. About a year later, Washington and Gallimore purchased an improved lot on Seaton Street in the District of Columbia as tenants by the entirety. The parties agree, however, that because Washington and Gallimore were not married they could not take the property as tenants by the entirety and that the estate they received was a joint

---

1. D.C.Code § 19–320 provides:

   (a) A person convicted of felonious homicide of another person, by way of murder or manslaughter, takes no estate or interest in property of any kind from that other person by way of:

   (1) inheritance, distribution, devise, or bequest; or

   (2) remainder, reversion, or executory devise dependent upon the death of the other person.

   The estate, interest, or property to which the person so convicted would have succeeded or would have taken in any way from or after the death of the decedent goes, instead, as if the person so convicted had died before the decedent.

   (b) Policies of insurance directly or indirectly procured by a person convicted as specified by subsection (a) of this section, for his own benefit or payable to him upon the life of the person killed by him, are void.

   (c) This section does not affect the rights of bona fide purchasers of property specified by subsection (a) of this section, for value and without notice.

tenancy with right of survivorship.[2] *Coleman v. Jackson*, 109 U.S.App.D.C. 242, 286 F.2d 98 (1960).

About nine years after Gallimore and Washington purchased the Seaton Street property and two years after they had stopped living together, Washington died of wounds she received during a brutal assault. A circuit court in Maryland convicted Gallimore of the murder and sentenced him to life imprisonment. After his conviction became final, appellees brought this action for declaratory judgment, seeking to quiet title to the Seaton Street property in themselves. The trial court granted appellees the relief they sought and Gallimore filed this timely appeal.

## II.

Appellees rest their claim that Gallimore forfeited to them his interest in the jointly owned Seaton Street property upon D.C.Code § 19–320(a), *supra* note 1. Gallimore contends that § 19–320(a) by its terms does not encompass property interests acquired by virtue of the right of survivorship associated with joint tenancies. If we were to hold that § 19–320 does apply, then we would be required to apply its provisions to the instant case. If, on the other hand, we were to agree that § 19–320 does not apply, we would have to determine whether § 19–320 nevertheless displaced the common law with respect to the disposition of property received by a murderer by virtue of a right of survivorship. If § 19–320 does not affect property interests acquired by virtue of rights of survivorship *and* displaces the common law, then Gallimore would be entitled to the whole property. If § 19–320 does not displace the common law, then we would apply the common law.

Given the foregoing scheme, there are four questions which we could conceivably have to answer: (1) Does D.C.Code § 19–320 apply to rights of survivorship? (2) If § 19–320 does not apply to rights of survivorship, does § 19–320 displace the common law with respect to property acquired by a murderer from his victim by virtue of a right of survivorship? (3) What result obtains under § 19–320? (4) What result obtains under the common law? We need to answer only the last three questions. We hold that, even assuming the statute did not apply to rights of survivorship, the statute would not displace common law with respect to property acquired by a murderer from his victim by virtue of a right of survivorship. Because we hold that the statute and the common law give the same result in the present case—a tenancy in common—we need not answer the first, difficult question of whether § 19–320 applies to rights of survivorship.

Before addressing the legal arguments, it is helpful to describe the property interest known as joint tenancy with right of survivorship. A joint tenant with right of survivorship has essentially two interests: (i) a present right to possession of the property in its entirety and an undivided portion of its profits, and the right to alienate that present right during her lifetime, and (ii) a future right to the whole property contingent on her outliving her joint tenant and the joint tenancy not being severed during their lifetimes. The concept is that upon the death of one of two joint tenants, there is no transfer of the decedent's future interest to the survivor; rather, the future interest of the deceased ceases to exist, the threat of severance by the other joint tenant is eliminated, and the present interest of the surviving joint tenant

2. Because no party has raised the issue, we do not decide whether a different result could obtain were we to try to approximate a tenancy by the entirety by creating, for each party, a tenancy in common for life with a contingent future interest in the whole. *Cf.* 4A RICHARD R. POWELL & PATRICK J. ROHAN, POWELL ON REAL PROPERTY ¶ 616[2], at 51–5 to –6 (1992) (noting that in some states in which joint tenancy is not recognized, courts have attempted to give effect to a grantor's intent by construing an attempt to create a joint tenancy as creation of tenancy in common with a

contingent remainder in the whole in favor of the survivor). *But see id.* at ¶ 621[1], at 52–13 to –15 (listing various approaches to the problem of an attempted grant of a tenancy by the entirety to persons not married, but not mentioning tenancy in common for life with remainder to the survivor). As discussed below, the exact interest held by the cotenants is a critical consideration in applying both the statute and the common law. *See infra* note 14 (noting that judgment might be different had Gallimore and Washington been tenants by the entirety).

in the whole property becomes exclusive. 4A POWELL & ROHAN, *supra* note 2, ¶ 617, at 51-10 to -11.

## A.

Appellees focus their argument on the second unnumbered paragraph of § 19-320(a), contending that it mandates that a killer be considered to have predeceased his victim in respect to property received in any way upon the death of the decedent, including property jointly held by the killer and his victim with right of survivorship. Because Gallimore must be considered to have predeceased Washington, appellees reason, his share of the joint estate passed first to Washington and then through her to them.

■ We question whether the statute, read as a whole, encompasses rights of survivorship. The first unnumbered paragraph of subsection (a) does not list rights of survivorship as among the means of succession covered by the subsection, nor does it contain general language that would permit us to read in such rights.[3] Rather than state that the section applies to all property interests, the statute specifies certain future estates, namely reversions, remainders and executory devises. The statute also specifies certain means of receiving property, by inheritance, distribution or bequest, all of which imply a transfer from one person to another, and which do not apply to the right of survivorship.

Construing the scope to be so limited is consistent with the origin of § 19-320, con-sidered in its context. Section 19-320 was enacted in 1965 as part of a codification of existing positive law relating to decedent's estates and fiduciary duties. Pub.L. No. 89-183, § 1 (Sept. 14, 1965). That act was not intended to work any substantive change in existing law. H.R.REP. No. 235, 89th Cong., 1st Sess. 1 (1965); U.S.Code Cong. & Admin.News 1965, p. 752, S.REP. No. 612, 89th Cong., 1st Sess. 3 (1965); U.S.Code Cong. & Admin.News 1965, p. 752, 111 CONG.REC. 21,-751 (1965) (statement of Rep. Willis). Section 19-320 was itself derived from section 961[4] of the 1901 Code, Act of March 3, 1901, ch. 854, 31 Stat. 1344. H.R.REP. No. 235, at 30 (noting that changes were made in phraseology); S.REP. No. 612, at 32 (same).

The 1901 Code was the result of decades of effort on the part of members of the bench and bar and citizenry of the District of Columbia to replace the patchwork of English, Maryland and congressional statutes, and ordinances, acts and regulations adopted by the various forms of local government that Congress had prescribed for the District up to that time, which then formed the positive law of the District. *See* H.R.REP. No. 1017, 56th Cong., 1st Sess. 4 (1900); 34 CONG.REC. 2501 (1901) (statement of Sen. Pritchard); Walter S. Cox, *Efforts to Obtain a Code of Laws for the District of Columbia, in* 3 RECORDS OF THE COLUMBIA HISTORICAL SOCIETY 115 (1900); *Codification of District Laws,* 26 WASH. L.RPTR. 786 (Dec. 15, 1898). A draft of the proposed code was first completed by Justice Walter S. Cox, of the Supreme Court of the

---

**3.** The second unnumbered paragraph of subsection (a) does refer to property "taken in any way." However, we do not think it possible to read that phrase as expanding the express list provided in the first unnumbered paragraph. First, to do so would render the list superfluous, a result which is disfavored. *See Abbot v. Bralove,* 85 U.S.App.D.C. 189, 190-91, 176 F.2d 64, 65-66 (1949) (holding that statute must be read to give all words some effect). Second, as discussed *infra,* omission of rights of survivorship is not irrational given the legal landscape that existed at the time section 921, the predecessor statute, was enacted.

**4.** Section 961 provided:

No person who shall be convicted of the felonious homicide of another, either by way of murder or manslaughter, shall take any estate or interest of any kind whatsoever in any kind of property whatsoever from that other by way of inheritance, distribution, devise, or bequest, or shall take any remainder, reversion, or executory interest dependent upon the death of that other; and the estate or interest or property to which the person so convicted would have succeeded or would have taken in any way from or after the death of the person so killed by him shall go as if the person so convicted had died before the person whom he shall be convicted of killing. And every policy of insurance procured, directly or indirectly, by the person so convicted for his own benefit or payable to him upon the life of the person so killed shall be void. This act shall not affect the rights of bona fide purchasers of any such property for value without notice.

District of Columbia, in the fall of 1898.[5] WALTER S. COX, CODE OF LAW FOR THE DISTRICT OF COLUMBIA (1898); *see also Code for the District of Columbia*, 26 WASH.L.RPTR. 593 (Sept. 22, 1898). The draft was then reviewed, amended and approved by committees of the bar association, the board of trade, and the Supreme Court of the District of Columbia before being presented to Congress for its consideration. H.R.REP. No. 1017, at 5.[6]

Unlike the partial codification in 1965, the 1901 Code was more than merely the enactment of a compilation of existing positive law. Both as proposed and as ultimately enacted, it changed in substantial and material ways both the judicial machinery and the legal rights of the citizens of the District. 34 CONG.REC. 3585 (1901) (statement of Rep. Babcock); *Editorial*, 26 WASH.L.RPTR. 801 (Dec. 22, 1898). The legislation did not, however, undertake to codify the common law of the District. H.R.REP. No. 1017, at 4. Instead, it expressly provided that the "common law ... shall remain in force except in so far as [it is] inconsistent with, or [is] replaced by, some provision of this code." Act of Mar. 3, 1901, ch. 854, § 1, 31 Stat. 1189.

The substance of what became section 961 was not contained in Justice Cox's draft. *See* Cox, *supra*, at 374. It was added during the examination by local attorneys, judges, and members of the business community that occurred before its first submission to Congress in early 1899. *See* S. 5530, 55th Cong., 3d Sess. § 989, at 215 (Feb. 18, 1899). As of that time, only eight reported decisions— none from this jurisdiction—addressed the question whether a slayer was entitled to acquire the property of his victim as a result of the victim's death. *Shellenberger v. Ran-*

som, 41 Neb. 631, 59 N.W. 935 (1894) *rev'g on reh'g* 31 Neb. 61, 47 N.W. 700 (1891); *Ellerson v. Westcott*, 148 N.Y. 149, 42 N.E. 540 (1896); *Riggs v. Palmer*, 115 N.Y. 506, 22 N.E. 188 (1889); *Owens v. Owens*, 100 N.C. 240, 6 S.E. 794 (1888); *Deem v. Millikin*, 6 Ohio C.C. 357 (1892), *aff'd mem.*, 53 Ohio St. 668, 44 N.E. 1134 (1895); *Carpenter's Estate*, 170 Pa. 203, 32 A. 637 (1895); *Lundy v. Lundy*, 24 S.C.R. 650 (Can.1895); *see also* John W. Wade, *Acquisition of Property by Wilfully Killing Another*, 49 HARV.L.REV. 715, 717 & nn. 9, 10 & 12, 719 & n. 17, 729 & n. 54, 733 & n. 64 (1936); *Owens, supra*, 6 S.E. at 795 (noting that the court was unable to locate a single precedent).

In four of the six jurisdictions represented by the early cases, the court held that the slayer could succeed to the property. *Wade, supra*, at 717 & nn. 9, 10. The reason chiefly given in the cases holding that the slayer could take was that the legislature had determined how property should pass and the court could not overrule the statute. *See Shellenberger, supra*, 59 N.W. at 939 ("Neither the limitations of the civil law nor the prompting of humanity can be read into a statute from which, without question, they are absent, no matter how desirable the result to be attained may be."); *Owens, supra*, 6 S.E. at 794 ("[W]hile the law gives the dower, and makes it paramount to the claims of creditors even, there is no provision for its forfeiture for crime, however heinous it may be, and even when the husband is its victim."); *Deem, supra*, 6 Ohio C.C. at 361 ("The natural inference is that when the legislature incorporated the general rule into the statute and omitted the exception, they intended that there should be no exception to the rule of inheritance prescribed."); *Car-*

---

5. In *Coleman, supra*, the court also took notice of Justice Cox's draft as pertinent legislative history. 109 U.S.App.D.C. at 244, 286 F.2d at 100.

6. The process of consultation and review appears to have been quite active. *Editorial*, 27 WASH. L.RPTR. 1 (Jan. 5, 1899) (noting that the Supreme Court suspended the hearing of cases to permit members of the bar to review the draft); *Editorial*, 27 WASH.L.RPTR. 113 (Feb. 23, 1899) (noting that code had been introduced in Congress at the end of the session); *Editorial*, 28 WASH.L.RPTR. 94 (Feb. 8, 1900) (noting that justices of the Su-

preme Court of the District of Columbia had taken a two week recess to join with a committee of the bar in reviewing and revising the draft code); *Editorial*, 28 WASH.L.RPTR. 185 (Mar. 15, 1900) (noting that bar association had unanimously adopted report of its committee concerning the code); *Editorial*, 28 WASH.L.RPTR. 201 (Mar. 22, 1900) (noting that a bill to establish a code had been introduced in Congress with the support of the bar association, the board of trade, and the justices of the courts of the District).

*penter's Estate, supra*, 32 A. at 637 ("The intestate law in the plainest words designates the persons who shall succeed to the estates of deceased intestates. It is impossible for the courts to designate any different persons to take such estates without violating the law."); Wade, *supra*, 49 HARV.L.REV. at 717. *But see Riggs, supra*, 22 N.E. at 189–91 (rejecting the reasoning of *Owens* in favor of principle "that matters embraced in the general words of statutes nevertheless [might not be] within the statutes, because it could not have been the intention of the law-makers that they should be included"); *see also Bryant v. Bryant*, 193 N.C. 372, 137 S.E. 188, 191 (1927) ("It is apparent ... that the appeal [in *Owens* ] was treated as presenting nothing more than a question of law.... It does not appear what the decision would have been if the equitable jurisdiction of the court had been invoked....").

In light of the decisions in other states and the provisions of the proposed code, the drafters of the 1901 Code had just reason to be concerned about whether the courts would intervene to prevent the property of a decedent from passing to his slayer pursuant to statutory provision. The 1901 Code contained provisions relating not only to taking by descent and testament, but also concerning reversions and future interests. Act of Mar. 3, 1901, ch. 854, §§ 940–60, 1018–30, 1623–33, 31 Stat. 1342–44, 1351–52, 1433–34. Except for the inclusion of a provision such as section 961, it would have been arguable, in the then-prevailing legal climate, whether a slayer could be barred from coming into possession of his victim's property by virtue of a future estate or by will or descent.[7]

The 1901 Code did not, however, address rights of survivorship. Joint tenancy is mentioned only twice: Section 93 of the Code permitted partition by a court of property held by joint tenants. 31 Stat. 1203. This was the same as was permitted prior to the adoption of the Code by virtue of the statutes of 31 Henry VIII ch. 1 and 32 Henry VIII ch. 32. *See* COMPILED STATUTES OF THE DISTRICT OF COLUMBIA ch. 51, secs. 12–15, at 424 (William S. Abert & Benjamin G. Lovejoy eds., 1894). Section 1031 of the Code also addressed joint tenancies by reversing the common-law presumption that a grant to more than one person created a joint tenancy instead of tenancy in common. 31 Stat. 1352. Given the absence of provisions in the 1901 Code addressing rights of survivorship and the state of the common law when Congress adopted the Code, there was at that time no apparent need to address in the Code a slayer's rights in property owned in joint tenancy with his victim.[8]

The foregoing is hardly conclusive on the question, however. It must be observed that section 961 also did not mention the rights of dower and estate by the curtesy, which were expressly provided for in the 1901 Code. §§ 1158–59, 1161–76, 31 Stat. 1375–77. If *Owens, supra*, which dealt with dower rights, were among the cases forming the impetus for adoption of section 961, it would seem curious that the drafters of section 961 omitted dower and estate by the curtesy from its coverage. Moreover, it is difficult to distinguish a remainder following a cotenant's life estate in her moiety, made contingent on the remainderman surviving that cotenant and neither tenant alienating her share or partitioning the property during the joint lifetimes of the cotenants, which would be covered by § 19–320(a), from the right of survivorship held by a joint tenant. *Cf.* 4A

---

**7.** It is interesting to observe, however, that in *Riggs, supra*, 22 N.E. at 190, the New York Court of Appeals noted that although several civil codes contained express prohibitions on slayers taking property by will or descent,

> so far as [the court] can find, in no country where the common law prevails has it been deemed important to enact a law to provide for such a case. Our revisers and law-makers were familiar with the civil law, and they did not deem it important to incorporate into our statutes its provisions upon this subject. This is not a *casus omissus*. It was

evidently supposed that the maxims of the common law were sufficient to regulate such a case, and that a specific enactment for that purpose was not needed.

Thus, the court based in part its decision to adopt a particular common-law rule on the *omission* of the legislature to so provide.

**8.** The Code also provides for rights of survivorship, without expressly referring to joint tenancy, in connection with deeds of trust to which more than one trustee is a party. § 534, 31 Stat. 1272. The implications of that fact are discussed below.

POWELL & ROHAN, *supra* note 2, ¶ 616[2], at 51–5 to –6 (noting that some courts have attempted to approximate a joint tenancy by substituting a tenancy in common with a contingent remainder in the whole in favor of the survivor). There would seem to be no rational basis on which to distinguish between the two simply because the same interest was created in a different way.

We think, however, that there could be other sound reasons for not including the right of survivorship attendant to a joint tenancy within the sweep of section 961. The joint tenancy with right of survivorship is a convenient means to ensure that the legal title held by trustees or partners does not pass out of the hands of those to whom the property has been entrusted for management or other purposes. For example, the 1901 Code expressly recognized that trustees with management or other responsibilities could hold legal title to property for the benefit of others. § 1617, 31 Stat. 1432. Under section 952 of the Code, however, a trustee's legal title descended as though it were the equitable title. 31 Stat. 1343. The 1901 Code also recognized the use of the deed of trust to secure loans with real property and provided for right of survivorship among joint trustees on a deed of trust and the removal of trustees and appointment of new ones. §§ 533, 534, 538, 31 Stat. 1272–74. Similarly, we have recognized that "[f]or the common law partnership, both tenancy in common and joint tenancy possessed attributes that were satisfactory for holding title to partnership realty." *District of Columbia v. Riggs Nat'l Bank*, 335 A.2d 238, 242 (D.C. 1975). Until the District's adoption of the Uniform Partnership Act in 1962, partnerships in the District were governed by the common law. *Id.* at 241.

In circumstances such as trust and partnership, where the legal and beneficial ownership may be divided, the rigid rule established by section 961 would not necessarily be the most convenient, expedient or just method of disposing of the interest held by a joint tenant murdered by his cotenant. By the same token, however, it is clear that a similarly rigid rule forbidding the courts from adjusting the passing of a murdered

cotenant's interest is not appropriate and could not have been intended by the legislature. Thus, we hold that, assuming Congress did not cover rights of survivorship under section 961, Congress also did not intend to "replace" the common law with respect to the treatment of rights of survivorship.

**B.**

If the result under the statute, assuming it applies, and what we hold to be the common law would be the same on the facts of this case, then we need not decide whether § 19–320(a) has application to property interests other than those listed in the first unnumbered paragraph, such as rights of survivorship. *See Napoleon v. Heard*, 455 A.2d 901, 903 (D.C.1983) (relying on both § 19–320(a) and common law to deny patricide benefits from father's life insurance). Therefore, we discuss the application of both the statute and the common law to the situation presented by this case.

**1.**

■ The second unnumbered paragraph of § 19–320(a), addresses the disposition of property that would be *received* by the killer "from or after" the death of the decedent, not property already owned by the killer. Thus, the statute does not even arguably address the disposition of Gallimore's interest in the property he jointly owned with Washington while she was alive; rather, the paragraph concerns only those of Washington's interests that might be received by Gallimore after, or as a result of, Washington's death.

■ When Gallimore murdered Washington, he destroyed her *future* interest in the property; it would be impossible for Gallimore to take for himself Washington's future right which was contingent on his own death. Consequently, by its terms the second paragraph of the subsection does not apply to Washington's future right because it did not transfer at her death. It is only Washington's *present* right that passes, according to the terms of the paragraph, as though Gallimore had predeceased Washington. Therefore, under the statute, Washington's heirs would take her present alienable right to

share in the possession and profits of the property, but they would not get her extinguished contingent future right to the remainder of the property. In other words, under the statute they would get a tenancy in common with Gallimore. *See* 4A POWELL & ROHAN, *supra* note 2, ¶¶ 603[1], 604[1] (describing incidents of tenancy in common).

Gallimore, as joint tenant, had the same package of present and future rights as Washington. With Washington's death, however, the future interest was determined and Gallimore's own future interest also ceased to exist. Therefore, even if application of § 19–320(a) were to prevent Gallimore from acquiring from Washington her present interest in the Seaton Street property (because that is the only interest that was capable of being transferred at the time of her death), the statute would not affect his own present estate at all because it did not change hands. In other words, under the statute Gallimore's joint tenancy interest would be converted to a tenancy in common with Washington's heirs.

Appellees' reliance on *Napoleon, supra,* is misplaced. In *Napoleon,* we had before us an interpleader action to determine who should receive the proceeds of a life insurance policy the deceased had purchased. By its terms, the policy was payable to the decedent's son, or, if he could not take the proceeds, to the decedent's estate. The decedent's son had been convicted of murdering his father and stepmother.

In holding that the son could not collect the insurance proceeds, we rested our decision on both the statute and the common law. Although we stated in *Napoleon* that the phrasing used in the second paragraph of subsection (a) indicated that the subsection is "to be interpreted broadly," 455 A.2d at 902, we did not rest our decision entirely on the statute.[9] Instead, we noted that the section did not repeal the common law and held that the common law barred one guilty of felonious homicide from receiving the proceeds of insurance on his victim. *Id.* at 903. Indeed,

we discussed with approval a decision of the Superior Court adopting the same rule even where the putative beneficiary had been acquitted of the crime, thus removing him from the terms of the statute. *Id.*

**2.**

■ We now turn from the statutory provision to the common law, which "remain[s] in force except insofar as [it is] inconsistent with, or [is] replaced by, some provision of the 1901 Code." D.C.Code § 49–301 (1990). Thus, we now seek to determine what result would best advance the policy of the common law. Unlike our task of statutory interpretation, in which we must adhere to the words of the statute, the common law is not frozen in time, but instead is " 'a system of law not formalized by legislative action, not solidified but capable of growth and development at the hands of judges.' " *Nelson v. Nelson,* 548 A.2d 109, 112 & n. 3 (D.C.1988) (quoting *Linkins v. Protestant Episcopal Cathedral Found.,* 87 U.S.App.D.C. 351, 354–55, 187 F.2d 357, 360–61 (1950)).

■ The common law policy that we discern is the same as the one many other courts have stated—to prevent a murderer from profiting from his wrong. *See, e.g., Colton v. Wade,* 80 A.2d 923, 925 (Del.Ct.Ch. 1951); *Price v. Hitaffer,* 164 Md. 505, 165 A. 470, 472 (1933); *Bierbrauer v. Moran,* 244 A.D. 87, 279 N.Y.S. 176, 179 (1935); *Bryant, supra,* 137 S.E. at 191; *Hicks v. Boshears,* 846 S.W.2d 812, 814 (Tenn.1993); *Preston v. Chabot,* 138 Vt. 170, 412 A.2d 930, 932 (1980); *State ex rel. Miller v. Sencindiver,* 166 W.Va. 355, 275 S.E.2d 10, 12 (1981). That policy is not inconsistent with § 19–320(a), nor was the common law policy changed by the statute. If anything, prevention of profit from murder is the general policy underlying the statute.

We do not, however, discern any common law policy to punish the murderer or compensate the decedent's heirs or next-of-kin by means of forfeiture of the murderer's property interest, either to the state or to

---

**9.** We note that insurance proceeds are property that is taken by the beneficiary only after death. Thus, they fall squarely within the terms of the second paragraph. That is not the case with

Gallimore's possessory interest in an undivided share of the Seaton Street property, which preexisted the death of Washington.

private persons.[10] Punitive and compensatory measures are more properly sought through criminal proceedings and a civil action for damages, including punitive damages, if appropriate. Those forms of proceeding provide the proper means for fixing the measure of punishment and compensation. The interest a murderer may have held jointly with his victim does not logically measure the quantum of damages, whether compensatory or punitive, stemming from his crime.

The cases and commentaries suggest three approaches to implementing the policy of denying the murderer any profit from his wrong. Section 188 of the Restatement (First) of Restitution provides:

> Where two persons have an interest in property and the interest of one of them is enlarged by his murder of the other, to the extent to which it is enlarged he holds it upon a constructive trust for the estate of the other.

RESTATEMENT (FIRST) OF RESTITUTION § 188 (1937).

Although the black-letter statement might be read to divest the murderer of only his cotenant's moiety, the comment describes a harsher application that would forfeit the murderer's own moiety:

> [W]here there are two joint tenants and the principle of survivorship is applicable . . . if one of them murders the other, the murderer takes by survivorship the whole legal interest in the property, but he can be compelled to hold the entire interest upon a constructive trust for the estate of his co-tenant, except that he is entitled to one-half of the income for life.

RESTATEMENT (FIRST) OF RESTITUTION § 188 cmt. b (1937).

That result is dictated, in the view of the Restatement, by the principle that "where it is doubtful whether or not [the murderer] would have had an interest if he had not committed the murder, the chances are resolved against him." *Id.* cmt. a.

■ In our view, the Restatement approach amounts to a forfeiture of the murderer's interest and goes beyond the common law's policy to prevent the murderer from enriching himself as a result of the murder. A possessory interest in fee and a possessory interest for life make a difference to a joint tenant personally only if the interest is liquidated during his lifetime—a fee interest will be worth substantially more than a mere life estate. A joint tenant may alienate his interest in the joint tenancy *in fee* at any time, thus severing the joint tenancy and destroying the rights of survivorship. 4A POWELL & ROHAN, *supra* note 2, ¶ 618[1][a], at 51–15 to –18; *cf. Maynard v. Sutherland,* 114 U.S.App.D.C. 169, 313 F.2d 560 (1962) (holding that joint tenant's execution of deed of trust in favor of *cotenant* did not effect severance). Thus, to use the Restatement's own words, since it· is *not* "doubtful" that the murderer would have had the power to alienate during his lifetime a fee simple interest in his moiety in the absence of the murder, there is no chance to be resolved against the murderer. The Restatement comment cannot be justified on the policy ground we have adopted.

The second possibility suggested by the authorities is that the share of the murderer pass to the estate of the decedent unless the murderer obtains a severance of the estate or a partition. *See* Wade, *supra,* 49 HARV. L.REV. at 732 (proposing statutory solution). Wade's approach recognizes the ease with which a joint tenancy is severed and also tries to preserve the decedent's right of survivorship. *Id.* at 733. That approach has some superficial appeal, but upon close consideration it is not satisfactory.

The reason Wade's solution is unsatisfactory is that preservation of the right of survivorship can only affect the successors of the

---

10. With respect to future interests, § 19–320(a) might be viewed to work a forfeiture of the murderer's property. That stems from the drafters' decision not to substitute the decedent's actuarial life for his actual life in measuring the prior estate. That decision may merely reflect a desire to avoid undue complication in accommo-dating a murderer, as well as to avoid giving the murderer a degree of certainty he did not previously possess. In any event, it is not a sufficient departure from the principle of preventing profit as the result of homicide to persuade us to adopt a policy favoring forfeiture of the murderer's present possessory estate.

murderer and the murdered joint tenant. While the murderer is alive, he may enjoy either the profits of his interest in the property or else liquidate his interest at its full value. Wade's solution has no effect upon him. Should the murderer die without severing the joint tenancy, however, then the successors of the murdered joint tenant are favored over the successors of the murderer. We perceive no compelling reason for so favoring the successors of the murdered joint tenant. In fact, the most probable circumstance in which Wade's rule would have practical effect is in the instance of a murder-suicide.[11] We do not think that the successors of the suicide are any less entitled to a share of the property jointly held than those of the victim.[12]

The last alternative is that the joint tenancy be deemed severed and converted to a tenancy in common. That is the result that obtained in cases such as *Johansen v. Pelton,* 8 Cal.App.3d 625, 87 Cal.Rptr. 784, 788 (1970).[13] We think that it is the result that best implements the policy principle that we find controlling in this case. By severing the

joint tenancy and substituting a tenancy in common, Gallimore neither gains nor loses any present possessory interest in the Seaton Street property. It is, however, impossible to preserve precisely and divide equally all the incidents of the joint tenancy after one of the tenants has slain the other. As the court in *Johansen* noted,

> The seeming anomaly that the part gained and the part lost cannot be reconciled is due to the fact that the inchoate rights—with survivorship—of the two joint tenants are in reality greater than the whole while the tenancy exists. Any solution must, therefore, at best be a compromise.... [We] conclude[ ] that a solution which recognizes the slayer's preslaying inchoate right to one-half the property is most equitable.

87 Cal.Rptr. at 791–92.

We join the *Johansen* court in finding that a severance of the murderer's and victim's joint tenancy is the solution that is most equitable, using the term in its nontechnical sense. Therefore, we hold that under the

**11.** The Simultaneous Death Act would not ordinarily have any effect on the result flowing from such an occurrence, as it applies only where there is no evidence that the joint owners died other than simultaneously. D.C.Code § 19–503 (1989).

**12.** We note that in the case of a murder-suicide, § 19–320(a) would not ordinarily operate to divest the heirs of the slayer/suicide because he could never be convicted—a requirement under the statute.

**13.** The court in *Johansen* stated that the whole property went to the murderer, but said that a "constructive trust" was impressed on the decedent's share in favor of the decedent's estate. We eschew the term "constructive trust" in the present context. As the Restatement (First) of Restitution points out, a constructive trust is not a true trust and does not give rise to any fiduciary relationship; it is merely a way of saying that because there would otherwise be unjust enrichment, the legal owner is obligated to convey title to property upon which the constructive trust is impressed to another. RESTATEMENT (FIRST) OF RESTITUTION § 160 & cmts. a, c (1937); *see also Harrington v. Emmerman,* 88 U.S.App.D.C. 23, 27 n. 9, 186 F.2d 757, 761 n. 9 (1950) (quoting Restatement). This way of putting things may have had substantial meaning at a time when relief termed "equitable" was distinct from relief termed "legal"; it may even serve a purpose

today to the extent that the rules applied now were developed at a time when that distinction was important. In the present case, however, we adopt a new rule of law and it is not helpful to cast it in anachronistic terminology.

Moreover, it has always been the duty of courts of law (as opposed to courts of equity) to ascertain and declare the title to real property. In the present case, we are simply stating a rule of law that under the circumstances of a case such as this one, a joint tenant may not succeed by right of survivorship to a share of the property owned by one he has murdered. Thus, there is no need to impress a "constructive trust" on the title to any portion of the Seaton Street property, for we determine today that as between Washington's estate and Gallimore, Washington's estate has the better claim to Washington's interest in the former joint tenancy. We note that the trial court has the authority to compel Gallimore to do whatever is necessary to ensure that the appropriate public records reflect that fact.

We note, however, that we are not presented with the situation in which a slayer has purported to convey to a third party the decedent's interest. Therefore, we express no opinion as to who would have a better claim in a contest between the decedent's estate and such a third party. *Cf.* D.C.Code § 19–320(c) ("This section does not affect the rights of bona fide purchasers of property specified by subsection (a) of this section, for value and without notice.").

common law, the joint tenancy between Gallimore and Washington has been severed, converting it to a tenancy in common.[14]

## III.

Because the result is the same under the statute and the common law, there is no need to determine which applies in this case. The decision is reversed and the case remanded for further proceedings consistent with this opinion.

*So ordered.*

SCHWELB, Associate Judge, dissenting:

This case requires us to consider two long-established legal maxims and, if possible, to find a way to accommodate them both. I refer to these maxims as Nos. I and II.

Maxim I, which sounds especially formidable in the Latin original,[1] and which, while "deeply rooted in our jurisprudence," remains very much alive today, *see Farris v. Compton,* 652 A.2d 49, 55 (D.C.1994), teaches us that "no man may take advantage of his own wrong." *Glus v. Brooklyn E. Dist. Terminal,* 359 U.S. 231, 232, 79 S.Ct. 760, 762, 3 L.Ed.2d 770 (1959). Maxim II, also of ancient vintage, instructs that "[e]quity abhors forfeitures," *Beard v. Goodyear Tire & Rubber Co.,* 587 A.2d 195, 203 (D.C.1991), and so, indeed, does the law. *Vicki Bagley Realty, Inc. v. Laufer,* 482 A.2d 359, 367–68 (D.C. 1984).

In my opinion, the majority, seeking to vindicate Gallimore's rights by vigorously enforcing Maxim II, has significantly diluted the force of Maxim I. The trial judge, on the other hand, applied Maxim I with vigor, but

believed (mistakenly, in my view), that Maxim II has no application. *See Washington v. Gallimore,* 122 Daily Wash.L.Rptr. 1125 (Super.Ct.D.C.1994).

The resolution of the case which is the most faithful to our statute and to underlying equitable principles, and which maintains the integrity of *both* maxims, can be found in the Restatement of Restitution, to which my colleagues accord less weight than it deserves. Gallimore should receive his share of the income from the property during his lifetime, but the entire property should pass to Ms. Washington's heirs after Gallimore's death.

## I.

### THE MAJORITY DILUTES MAXIM I

Section 19–320(a) of the District of Columbia Code (1990), quoted in full in note 1 to the majority opinion, is perhaps the paradigmatic statutory expression of the maxim that no man may profit from his own wrong.[2] Paraphrased to fit these facts, the statute provides that Gallimore takes "no estate or interest in property of any kind" from Ms. Washington by way of "inheritance, distribution, devise or bequest," or "remainder, reversion, or executory devise" dependent upon Ms. Washington's death. The statute goes on to state that any such "estate, interest or property" to which Gallimore "would have succeeded or would have taken in any way" from or after Ms. Washington's death "goes, instead, *as if [Gallimore] had died before [Ms. Washington].*" (Emphasis added). This court has held that § 19–320 is to be broadly construed. *See Napoleon v. Heard,*

---

14. We note, however, that our reasoning, and therefore result, might be different with respect to an interspousal murder where the parties held property as tenants by the entirety. *Cf. Johansen, supra,* 87 Cal.Rptr. at 789 n. 8 (observing that "the equal division rule [is] more applicable to joint tenants than to tenants by the entirety because the latter have no right to sever or partition except when the marriage is terminated by divorce"); Wade, *supra,* 49 Harv.L.Rev. at 728 (proposing that slayer receive one-half life estate in property held by tenancy by the entirety, remainder to the estate of the decedent).

1. *"Nullus commodum capere potest de injuria sua propria."* See John W. Wade, *Acquisition of*

*Property by Willfully Killing Another,* 49 Harv. L.Rev. 715, 715 (1936).

2. The "wrong" which Gallimore inflicted upon Ms. Washington was not just any little old wrong, but the ultimate one—deliberate, premeditated murder. According to a newspaper article attached to the verified complaint, the sentencing judge called the slaying of Ms. Washington "one of the most brutal he has handled on the bench." Ms. Washington was found dead of numerous stab wounds in a Silver Spring motel. The prosecutor was also prepared to present evidence of prior domestic violence on Gallimore's part.

455 A.2d 901, 902 (D.C.1983). This means that ambiguities, if any, must be resolved against Gallimore to assure that he does not profit in any way from his murder of Ms. Washington.

Notwithstanding the broad phrasing of the statute and the decision in *Napoleon*, my colleagues have decreed a partition of the jointly held property and have ordered the distribution to Gallimore of an undivided share of it.[3] The trial judge explained effectively why Gallimore should not be rewarded in this way:

> First and foremost, as mentioned above, awarding the Defendant an unrestricted one-half interest in the property allows the Defendant to take advantage of his own wrong. John Wade, [*supra* note 1], 49 HARV.L.REV. at 733.[4] The right of survivorship in a joint tenancy "means that the joint tenant who survives the other cotenants takes the entire estate." 4A RICHARD R. POWELL, POWELL ON REAL PROPERTY, ¶ 624[2], at 51–11 (1993). The Decedent's ability, or right, to survive the Defendant has been snuffed out at the hands of the Defendant. Granting the Defendant a one-half interest in the property ... rewards the Defendant for his act of murder by giving him a definite interest in the property.

The Defendant attempts to differentiate a joint tenancy from other interests explicitly covered by D.C.Code § 19–320(a) by advancing the statutory purpose as being to "prevent the morally repugnant result of awarding a *new property interest* to a slayer based on his illicit act." Defen-

dant's Motion, p. 6. The Defendant claims that since a joint tenant possesses a one-half interest that is "easily severed at any time," recognizing him as a tenant in common with a one-half interest does not award a new property interest.

This Court wholly disagrees with the Defendant's conclusion. The Defendant opted to possess property as a joint tenant, running the risk that he could lose his entire interest should he predecease Annie Mae Washington. The Defendant never moved to partition the property. Awarding the Defendant a one-half interest as a tenant in common provides the Defendant with the certainty of some kind of an interest. The Court concludes that this new certainty, in contrast to the prior possibility, is, in fact, a new property interest. *Washington, supra*, 122 Daily Wash.L.Rptr. at 1133 (emphasis in original).

It is true that Gallimore could have sought a partition of the property during Ms. Washington's lifetime. He began living in the house in 1984, however, and made no attempt to secure a partition during the following ten years. *Id.* at 1133 & n. 8. I agree with the trial judge that the court should not now do for a murderer's benefit that which he could have done, but did not do, for himself.[5]

The decedent was seven years younger than Gallimore, but I agree with the trial judge that this is irrelevant. *Id.* at 1133 & n. 6 (citation omitted). We can never know which of the two would have survived the other if Gallimore had not murdered Ms. Washington. Section 19–320, however, resolves any problem presented by the lack of

---

3. Gallimore has argued in his brief that he is entitled to one-half of the value of the property. As I read the majority opinion, it does not specify whether he is entitled to a half-share or something different. I discuss this issue in Part IV C, *infra*.

4. In his article in the Harvard Law Review, John Wade also aptly identifies what I view as the weakness in the majority's argument. The murderer was a joint tenant who, according to Wade,

> has now killed the person with whom he held the property jointly; can he say that this is an act which separates the property, so that he can now hold half of it without any restriction? No. By doing so he is attempting to take advantage of his own wrong. The decedent

had a chance that he might survive the slayer and thus take all of the property. A separation of the property deprives him of that chance and gives to the slayer the certainty that he will keep half.

49 HARV.L.REV. at 733.

5. If Gallimore had taken legal action during his lifetime to acquire a partition, he would have had to expend time, effort, and (presumably) legal fees. He claims that he was gainfully employed during the period 1977–1983 and that he contributed to the mortgage at that time. Now, as a result of his conviction, he is incarcerated, Ms. Washington's heirs had to sue him, and the case is being defended for him by a law school legal clinic which provides representation to the poor.

a crystal ball by effectively creating a conclusive presumption that the decedent would have survived the murderer. It provides that any affected interest in property "goes, instead, as if the [murderer] had died before the decedent."

If there had been no murder, and if Gallimore had pre-deceased Ms. Washington, Gallimore would have had an interest during his lifetime, but Ms. Washington would have owned the property outright at his death. The majority's disposition awards Gallimore substantially more than he would have had if he had not killed the decedent. This result, in my opinion, is irreconcilable both with the letter of the statute and with the legislative purpose.

## II.

### THE TRIAL JUDGE TOLERATES A FORFEITURE

The trial judge, in my view, correctly declined to partition the property or to award an undivided half share to Gallimore. She went further, however, and held that Gallimore no longer had *any* interest in the jointly held premises. I cannot agree with that disposition, for it effects a forfeiture of Gallimore's interest during his own lifetime.

In *Pannone v. McLaughlin,* 37 Md.App. 395, 377 A.2d 597 (1977), a case in which a husband killed his wife and committed suicide shortly thereafter, the court enunciated

> the principle that a murderer cannot enrich his estate by his act of wrongdoing, but neither can he be deprived of an interest in property which he possessed at the time he committed his wrongful act. An unconstitutional forfeiture would result in the latter instance.

*Id.* 377 A.2d at 600. The trial judge was aware of the *Pannone* decision, but distinguished it upon the ground that "*Pannone* turned upon the application of Maryland's Constitution and Declaration of Rights pro-

6. The judge cited Md. Const.Decl. of Rights, Art. 27.

7. I refer to the following observations about the Institute by the Supreme Court of Maine:
   We think it is pertinent at this point to record something of the establishment, organiza-

hibiting forfeiture of property based on a conviction."[6] *Washington, supra,* 122 Daily Wash.L.Rptr. at 1133. She pointed out that the District has no such constitutional provision, nor does it have a statute proscribing such forfeitures. *Id.; cf. Johansen v. Pelton,* 8 Cal.App.3d 625, 87 Cal.Rptr. 784, 790 (1970).

The lack of any such constitutional or statutory provision does not mean, however, that a forfeiture is a presumptively acceptable remedy in the District of Columbia. `Maxim II makes it plain that, on the contrary, forfeitures are disfavored. This court has put it this way:

> Equity abhors forfeitures. *Berg v. Slaff,* 125 A.2d 844, 846 (D.C.1956). Statutes or regulations which impose forfeitures ... are penal in nature and must be strictly construed. *See generally* 3 N. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 59.02, at 7–8 (4th ed. 1986).

*Beard, supra,* 587 A.2d at 203.

Section 19–320(a) is broadly phrased, but I can find in it no provision clearly authorizing, or indeed authorizing at all, the forfeiture of an interest in property which the murderer owned prior to the homicide. The statute precludes a murderer from profiting from his own wrong, but it does not confiscate property which was previously his. Given the rule of strict construction articulated in *Beard,* I do not think that this aspect of the trial judge's disposition can be sustained.

## III.

### THE RESTATEMENT GETS IT RIGHT

My colleagues have rejected the resolution of this case suggested by the Restatement of Restitution. I believe that this is a mistake.

Restatements of the law are, of course, published by the American Law Institute. The Institute is comprised of especially distinguished judges, attorneys and scholars.[7]

tion and object of the American Law Institute. The Institute was organized on February 23, 1923. The organizational meeting was attended by the Chief Justice of the United States, and other representatives of the Supreme Court, representatives of the United States Cir-

Accordingly, "[t]he Restatement may be regarded both as the product of expert opinion and as the expression of the law by the legal profession." *Poretta, supra* note 7, 137 A.2d at 373; *see also* 20 AM.JUR.2D *Courts* § 67, at 433 (1965 & Supp.1995). We have treated the Restatement of Contracts as authoritative "[i]n the absence of any current well-developed doctrine in our jurisdiction." *Ellis v. James V. Hurson Assocs.,* 565 A.2d 615, 619 (D.C.1989). Some courts have flatly stated that they will follow the Restatement of the Law "where we are not bound by the previous decisions of this court or by legislative enactment, feeling that by so doing uniformity of decision would be more nearly effected." *See, e.g., Smith v. Normart,* 51 Ariz. 134, 138, 75 P.2d 38, 42 (1938). In the present case, it is undisputed that there is no binding precedent in this jurisdiction on the question which has been presented to us.

The basic rule propounded by the American Law Institute in this area of the law is based on Maxim I:

§ 188. WHERE MURDERER'S INTEREST IS ENLARGED BY THE MURDER.

Where two persons have an interest in property and the interest of one of them is enlarged by his murder of the other, to the extent to which it is enlarged he holds it upon a constructive trust for the estate of the other.

RESTATEMENT (FIRST) OF RESTITUTION, § 188 (1937). The Institute has also specifically addressed the application of this rule to a joint tenancy:

In such a case if one of [the joint tenants] murders the other, the murderer takes by survivorship the whole legal interest in the property, but he can be compelled to hold the entire interest upon a constructive

trust for the estate of his co-tenant, *except that he is entitled to one-half*[8] *of the income for life.* It is immaterial that each of them might have compelled a partition before the death of either.

*Id.,* cmt. (b) (emphasis added). The Institute has taken this position because, "where it is doubtful whether or not [the murderer] would have had an interest if he had not committed the murder, the chances are resolved against him." *Id.*

The Restatement approach is both sound and consistent with our statute. It places the murderer in a position equivalent to the one which he would have occupied if he had not committed the murder and if he had died first. During his lifetime, the murderer would have been entitled to his share of the income from the property, and that is what the Restatement rule permits him to receive. Upon his death, the entire property goes to the decedent's heirs. This disposition avoids the forfeiture which would be effected by the trial judge's order and which, in my opinion, precludes our affirmance of her decision. Moreover, contrary to my colleagues' view, the Restatement approach does not "amount . . . to a forfeiture," for it leaves Gallimore precisely where he would have been if he had died first.

The majority prefers to "eschew the term 'constructive trust' in the present context." Although this court continues to utilize this device in order to achieve the equitable resolution of problems similar to the one here presented, *see, e.g., Gore v. Gore,* 638 A.2d 672, 675–76 (D.C.1994), I can sympathize with my colleagues' criticism of "anachronistic terminology." See Op. at 1210 note 13. In any event, I am not concerned with labels, for

cuit Courts of Appeals, the highest courts of a majority of the States, the Association of American Law Schools, and the American and State Bar Associations. The Institute was composed of Justices of the Supreme Court of the United States, senior judges of the United States Circuit Courts of Appeals, the chief justices of the highest courts of the several States, and president and members of the Executive Committee of the American Bar Association, the presidents of certain learned legal societies, and the deans of member schools of the Association of American Law Schools. Its object as ex-

pressed in its charter was to promote the clarification and simplification of the law and its better adaptation to social needs, to secure the better administration of justice, and to carry on scholarly and scientific legal work.
*Poretta v. Superior Dowel Co.,* 153 Me. 308, 137 A.2d 361, 373 (1957).

**8.** Although the Restatement provides for one half, the presumption that Gallimore's share in this case is a one-half share is a rebuttable one. See Part IV C, *infra.*

What's in a name? That which we call a rose By any other name will smell as sweet.

WILLIAM SHAKESPEARE, *Romeo and Juliet,* Act II, sc. 2. The important point, to me, is the result—Gallimore should receive an appropriate share of the income from the property during his lifetime, and thereafter the entire property should pass to Ms. Washington's heirs.

## IV.

## OTHER ISSUES

I find it necessary to make three additional comments on the majority's approach to this case.

### A. The Statute Preempts the Common Law.

First, I agree with my colleagues that, in this case, § 19–320(a) and the common law lead to the same result, even though they and I differ as to what that result should be. I also agree that the common law is "a system of law not formalized by legislative action, not solidified but capable of growth at the hands of judges." *Nelson v. Nelson,* 548 A.2d 109, 112 & n. 3 (D.C.1988) (quoting *Linkins v. Protestant Episcopal Cathedral Found.,* 87 U.S.App.D.C. 351, 354–55, 187 F.2d 357, 360–61 (1950)). But this court stated in *Nelson,* immediately before the language quoted by the majority, that *"[i]n the absence of statutory enactment,* this court will look to the common law." 548 A.2d at 112 (emphasis added).

The italicized language is all-important. Where, as here, the legislature has spoken, it is not the business of judges to develop new common law doctrines independent of the statute. Surely my colleagues do not suggest that where a statutory enactment authorizes a particular result only in situations A, B, and C, a court which is not satisfied with this arrangement can order the same result in situation D by "creative expansion" of the common law or by some similar doctrine. If that is what the majority means, then today may become known as liberation day for

judicial activism. We should recognize, as did the Supreme Court of West Virginia in construing its analogue to § 19–320(a), that by detailing the interests which the murderer is precluded from taking, "the [l]egislature has in effect preempted the matter." *State ex rel. Miller v. Sencindiver,* 166 W.Va. 355, 275 S.E.2d 10, 14 (1981); *cf. Cheatle v. Cheatle,* 662 A.2d 1362, 1365, 1367 n. 5 (D.C.1995) (raising but not deciding the question whether § 19–320(a) preempts the common law).[9]

### B. The Murderer's Heirs—The Secondary Victims of His Crime.

Second, my colleagues complain that in case of a disposition different from the one which they have selected, "the successors of the decedent are favored over the successors of the murderer." In my opinion, this solicitude for Gallimore's heirs is unwarranted. Whenever a wrongdoer commits a crime and is punished for it, whether by incarceration, a fine, or an order of restitution, his or her next of kin are bound to suffer. They become the secondary victims of the crime. One incentive for a father not to murder anyone is that, if he does so and is apprehended, he will be punished and will not be able to care for his family. People who obey the law and work hard often do so for the benefit of their children. It is neither contrary to our statute nor inequitable to provide a law-abiding decedent's heirs with benefits not available to the heirs of a convicted murderer.

The situation facing Gallimore's heirs under the Restatement approach is unfortunate. To be the next of kin of a killer is not a happy thing. Legally, however, the murderer's heirs stand in his shoes. If he has no right to something, then they have no right to inherit that something from him.

### C. Gallimore's Share.

Finally, I think it necessary to advert to an issue not explicitly addressed by the majority but critical to its own resolution of the case. My colleagues hold that Ms. Washington's

---

9. The common law retains its vitality, of course, with respect to issues which the legislature did not address.

share of the tenancy in common which they have created passes to her estate. Presumably, Gallimore's share is what is left over. Gallimore apparently assumes that his share is a one-half share, and the trial judge treated the question as being whether Gallimore was entitled to "an undivided half-interest or moiety." *Washington, supra,* 122 Daily Wash.L.Rptr. at 1132. Gallimore's assumption, however, is not necessarily correct.

Because the purported tenancy in common in this case developed from a purported tenancy by the entireties and an actual joint tenancy, there is a presumption that each tenant is entitled to an equal share of the proceeds. *Sebold v. Sebold,* 143 U.S.App. D.C. 406, 414, 444 F.2d 864, 872 (1971). "This presumption is subject to rebuttal, however, and does not prevent proof from being introduced that the respective holdings and interests of the parties are unequal." *Id.* (quoting *Jezo v. Jezo,* 23 Wis.2d 399, 127 N.W.2d 246, 250 (Wis.1964) (*Jezo I* ), modified *Jezo v. Jezo,* 23 Wis.2d 399, 129 N.W.2d 195, 196–97 (Wis.1964) (per curiam) (*Jezo II* )); *see also Duston v. Duston,* 31 Colo. App. 147, 498 P.2d 1174, 1175 (1972); *Wallace v. Riley,* 23 Cal.App.2d 669, 74 P.2d 800, 806 (1937); 48A C.J.S. *Joint Tenancy* § 22, at 357 (1981 & Supp.1994).

It appears to be undisputed that when Gallimore and Ms. Washington began their relationship, he moved into her home. Ms. Washington's heirs claim that he contributed nothing at all to the payment of the mortgage. Gallimore asserts in his brief that he contributed until 1983; in his affidavit, he claims to have done so until 1984. It appears that after 1984, Ms. Washington's daughter lived in the house and paid rent of $300 per month to her mother, an amount in excess of the $232 monthly mortgage payment. In any event, Gallimore does not claim to have contributed to the mortgage for more than a decade.

"The determination as to whether the presumption [that joint tenants own equal shares] was overcome by the evidence is a question of fact for the trial court." *Duston, supra,* 498 P.2d at 1175. Because the trial

judge held that Gallimore receives nothing, she found it unnecessary to resolve the factual issues regarding Gallimore's contribution. Although not necessarily controlling, evidence of unequal contributions is a factor to be considered. *Sebold, supra,* 143 U.S.App. D.C. at 414, 444 F.2d at 872; *Jezo II, supra,* 129 N.W.2d at 197. Accordingly, in my opinion, the majority's disposition requires a remand to resolve this issue.[10]

### V.

### CONCLUSION

For the foregoing reasons, I respectfully dissent.

---

**10.** If the Restatement approach were followed, the trial court would be required on remand to

determine the value of Gallimore's life estate in the income from the property.